FOR PRINT PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| AMERICA'S RECOMMENDED MAILERS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 4:07-CV-348 |
| MARYLAND CASUALTY COMPANY, | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

The following motions are pending before the court:

1. Defendant's motion for summary judgment (docket entry #18);

2. Plaintiff's suggestions in opposition to Defendant's motion for summary judgment (docket entry #23);

3. Plaintiff's cross-motion for partial summary judgment and supporting memorandum of law (docket entry #24); and

4. Defendant's reply to Plaintiff's suggestions in opposition to Defendant's summary judgment motion, and response to Plaintiff's cross-motion for partial summary judgment (docket entry #25).

Having considered the parties' motions for summary judgment and the respective responses, the court is of the opinion that the Plaintiff's motion for summary judgment should be denied and the Defendant's motion for summary judgment should be granted.

## BACKGROUND

The relevant facts of this case are not in dispute. The Defendant, Maryland Casualty Company ("Maryland"), issued a commercial property and general liability insurance policy to the Plaintiff, America's Recommended Mailers, Inc. ("ARM"), under policy number PAS 35847491. The policy was effective from December 1, 2003 to December 1, 2004. The policy was subsequently renewed twice. The first renewal was effective December 1, 2004 to December 1, 2005 and the second renewal was effective December 1, 2005 to December 1, 2006.

In September 2006, AARP sued ARM and others in the General Court of Justice, Superior Court Division, Guilford County, North Carolina, in a lawsuit styled *AARP v. American Family Prepaid Legal Corporation, Inc., et al.*, cause number 06-CVS-10216. As alleged by AARP, the underlying facts leading to the instant lawsuit are as follows (*see* Def.'s Mtn. for Summary Judgment, Exhibit 1 – Plaintiff's Amended Complaint):

1. AARP's insurance and financial services are advertised, provided and sold under the mark "AARP". AARP licenses its mark to certain companies that offer financial services. AARP receives licensing fees for the use of its mark in connection with the sale of financial and insurance services. (¶ 15);

2. As a result of AARP's continuous and widespread use of its mark, the mark has become famous and has acquired significant goodwill and widespread public recognition throughout the United States. (¶ 17);

3. ARM and others[1] sold unauthorized lead cards featuring AARP's trademark to insurance agencies and financial services companies. (¶ 19);

4. The Mail House Defendants mailed the AARP cards through the United States mail by the tens of millions to seniors throughout the United States. (¶ 20);

5. Recipients of the Mail House Defendants' AARP cards falsely believed that such cards came from AARP. The Mail House Defendants designed the cards to create

---

[1]AARP refers to ARM and the other like Defendants as the "Mail House Defendants."

such an impression. (¶ 21);

6. The cards misrepresented AARP's views concerning probate matters. (¶ 22);

7. Certain other Defendants, known as the Financial Services Defendants, purchased the AARP cards from the Mail House Defendants. The Financial Services Defendants hired ARM to mail the AARP cards via the United States mail to senior citizens throughout the United States. The completed AARP cards were then returned to a post office box that is owned and operated by the Mail House Defendants. The Mail House Defendants subsequently sent the cards to the Financial Services Defendants. (¶¶ 26 & 27);

8. Thereafter, the Financial Services Defendants contacted the senior citizens who completed and returned the cards to set up an appointment to provide the free information offered on the card. The free information was actually a guise for a high pressure sales pitch about financial services and living trusts. Because the senior citizens believed that the AARP cards actually came from AARP, they also believed that the Financial Services Defendants, as well as their products and services, were endorsed by, or connected to, AARP. (¶ 28);

9. The Salesman Defendants, who are representatives of some of the Financial Services Defendants, followed-up on the completed and returned AARP cards by attempting to sell living trusts and financial services to senior citizens. (¶ 34). In doing so, the Salesman Defendants deceived consumers into believing that the cards came from, and were endorsed by, AARP. (¶ 36);

10. "The Financial Services Defendants and the Mail House Defendants constitute an enterprise that is engaged, and have conspired to engage, in a scheme to pass off living trusts, annuities and other financial and insurance products as AARP-endorsed. The Financial Services Defendants and the Mail House Defendants use the United States Mail and the United States Post Office Boxes in furtherance of that scheme. The predicate acts for the racketeering are mail fraud and trademark counterfeiting." (¶ 39);

11. "The Financial Services Defendants and the Mail House Defendants have conspired together to design and create and then mail counterfeit AARP cards to millions of seniors throughout the United States via the United States Mail and have used United States Post Office Boxes in furtherance of that scheme. The scheme is aimed at millions of seniors and has been ongoing between the Financial Services Defendants and the Mail House Defendants since at least as early as July 2004. The counterfeit AARP cards used and designed by the Financial Services Defendants and the Mail House Defendants cause seniors to believe that they are dealing with AARP and that the financial and insurance products and services of the Financial Services

Defendants' [sic] are AARP-endorsed." (¶ 40);

12. AARP sued the Defendants as follows:

   A. Violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962;

   B. Trademark counterfeiting in violation of 15 U.S.C. § 1114 ("Defendants use a counterfeit AARP mark in connection with the advertising, promotion, distribution and sale of financial and insurance products, including annuities and living trusts, and in connection with printed materials on certain subjects, which constitutes trademark counterfeiting in violation of 15 U.S.C. section 1114(a).") (¶ 103);

   C. Trademark infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1114 ("Defendants are using AARP in connection with advertising, promotion, distribution and sale of lead cards, mailers, living trusts, annuities and other financial and insurance products and services.") (¶ 108);

   D. Trademark infringement, false designation of origin and unfair competition in violation of 15 U.S.C. § 1125 ("Defendants are using AARP in connection with the advertising, promotion, distribution and sale of their lead cards, mailers, living trusts, annuities and other financial products and services.") (¶ 114);

   E. Trademark dilution in violation of 15 U.S.C. § 1125 ("Defendants are using Plaintiff's identical mark AARP in connection with the advertising, promotion, distribution and sale of Defendants' products and services.") (¶ 120); and

   F. Violations of North Carolina laws.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *See id.* at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant must adduce affirmative evidence. *See Anderson*, 477 U.S. at 257.

## DISCUSSION AND ANALYSIS

### 1. DUTY TO DEFEND

The issue for determination is whether Maryland has a duty to defend ARM in the underlying state court action. Maryland argues that the claims against ARM in the underlying lawsuit do not state a claim for "personal and advertising injury" as that term is defined in Maryland's policies. Additionally, Maryland argues that the following exclusions bar coverage:

1.  trademark exclusion;

2. insureds in media exclusion;

3. prior publication exclusion; and

4. knowing violation of rights exclusion.

In this diversity suit, Texas law governs this court's determination of whether Maryland has a duty to defend ARM.[2] "Generally, Texas state courts analyze whether the duty to defend arises by examining only two things: (1) the insurance contract; and (2) the claimant's petition in the underlying suit against the insured." *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F.Supp.2d 601, 606 (E.D. Tex. 2003). "'An insurer's duty to defend is determined solely by the allegations in the pleadings and the language of the insurance policy.'" *Id.*, citing *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). This analysis is commonly referred to as the "eight corners" rule. *Westport*, 267 F.Supp.2d at 606. In conducting its analysis under the eight corners rule, the court must first construe the contract. *Id*. After doing so, the court then "must examine the factual allegations made in the underlying suit and determine whether those allegations could possibly state a claim covered by the insured's policy." *Id*.

In making this coverage determination, the court should construe the terms of the insurance contract "against the insurer to avoid excluding coverage, so long as more than one reasonable interpretation exists." *Id.*, citing *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Willis*, 296 F.3d 336, 339 (5th Cir. 2002). "The insured's construction of the exclusionary clause must be adopted as long as that construction is not unreasonable." *Id*. "This is the case even if the insurer's proffered construction would be more reasonable." *Id.*, citing *Insurance Co. of North America v. Cash*, 475 S.W.2d 912 (Tex. 1971). "However, these preferences for adopting the insured's interpretation only

---

[2]The parties do not dispute that the court should apply Texas law to this lawsuit.

apply where the contract language is ambiguous." *Id.*, citing *Mang v. Travelers Ins. Co.*, 412 S.W.2d 672, 674 (Tex. Civ. App. 1967, writ ref'd). Notably, "if the allegations in the underlying pleadings could even potentially trigger coverage, and the allegations do not on their face conclusively activate an exclusion, then the insurer must defend its insured against the claim." *Id.* at 612, citing *King*, 85 S.W.3d at 187.

Considering these standards, the court turns to the policy provisions and allegations in the underlying suit. The policy provides as follows:

**SECTION III – LIMITS OF INSURANCE**

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

    ******

**SECTION V – DEFINITIONS**

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or

        lessor;

    d.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e.    Oral or written publication of material that violates a person's right of privacy;

    f.    Misappropriation of advertising ideas or style of doing business;[3] or

    g.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".[4]

******

## EXCLUSIONS

## ELECTRONIC DATA LIABILITY AMENDMENT ENDORSEMENT

(12)    Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights;

However, this exclusion does not apply to infringement in your "advertisement", of copyright, trade dress or slogan[.]

******

**2.**    **Exclusions**

This insurance does not apply to:

    a.    "Personal and advertising injury":

        (1)    Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

---

[3] Subpart (f) was removed from the definition of "personal and advertising injury" in the 2005 renewal policy.

[4] The parties agree that only subparts (f) and (g) are applicable.

> (3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;
>
> (9) Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to Paragraphs **14a, b and c** of "personal and advertising injury" under **SECTION V – DEFINITIONS**[.]

With respect to subpart (f), ARM argues that "misappropriation of advertising ideas or style of doing business" is broad and includes infringement of trade dress. ARM further contends that trade dress includes the trademark itself. According to ARM, AARP's allegation that "Defendants' unauthorized use of and reference to AARP is likely to cause confusion, to cause mistake and to cause deception that Defendants' products and services come from or are endorsed, approved or licensed by AARP[,]" (¶ 115) exceeds mere trademark infringement.

"The Lanham Act, 15 U.S.C. § 1125(1), establishes a cause of action for trade dress infringement." *Eppendorf-Netheler-Hinz Gmbh v. Ritter Gmbh*, 289 F.3d 351, 354 (5th Cir. 2002). "'Trade dress' refers to the design or packaging of a product which serves to identify the product's source." *Id*. at 354-55 (citation omitted). "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing products.'" *Id*. at 355, quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992) (citation omitted).

It is clear, however, that AARP's complaint only sounds in trademark infringement, not trade dress infringement. AARP complains that ARM and others have infringed upon its trademarks. AARP specifically alleges that it owns certain trademarks for its insurance and financial services.

AARP complains that ARM has allegedly infringed on those trademarks. As noted by Maryland, the significance of ARM's attempt to recast AARP's allegations as trade dress rather than trademark infringement is that of avoidance. The Fifth Circuit has already ruled that Texas law does not view a trademark as a marketing device. *Sport Supply Group, Inc. v. Columbia Casualty Co.*, 335 F.3d 453, 464 (5th Cir. 2003). "Texas law has adopted the more conventional understanding of a trademark as a *label* that serves primarily to *identify* and *distinguish* products." *Id*. Accordingly, under Texas law, the AARP trademark is not "advertising." *See id*. 464-65. It follows, then, that the idea for the AARP trademark is not an "advertising idea," and that the infringement of the AARP trademark is not the "misappropriation of advertising ideas." *See id*. at 465.[5]

Similarly, with respect to subpart (g), ARM's argument fails. Since AARP's complaint does not address a copyright, trade dress or slogan, subpart (g) is inapplicable. As such, ARM has failed to establish that AARP's claims are for "personal and advertising injury." Accordingly, ARM is not entitled to coverage under the insuring agreement. Maryland owes no duty to defend ARM.[6]

### 2. BREACH OF CONTRACT

In its motion for partial summary judgment, ARM contends that Maryland breached its contract with ARM by failing to defend it in the AARP matter. "Under Texas law, the elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Sport Supply Group, Inc.*, 335 F.3d at 465 (citations omitted). ARM's breach of

---

[5]ARM has only presented argument with respect to the "misappropriation of advertising ideas" portion of subpart (f).

[6]Since Maryland's policy does not cover any of AARP's allegations, it is not necessary for the court to examine the policy exclusions.

contract claim is identical to its duty to defend claim. For the reasons stated above, ARM's breach of contact claim likewise must fail.

## **CONCLUSION**

Based on the foregoing, the court finds as follows:

1. Defendant's motion for summary judgment (docket entry #18) is **GRANTED**; and

2. Plaintiff's cross-motion for partial summary judgment (docket entry #24) is **DENIED**.

**SIGNED this the 23rd day of September, 2008.**

_Richard A. Schell_
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE